In re ELSINORE SHORE ASSOCIATES, f/k/a Playboy Elsinore Associates, a New Jersey partnership, d/b/a the Atlantis Casino Hotel, Debtor-in-Possession.

ELSINORE SHORE ASSOCIATES, f/k/a Playboy Elsinore Associates, a New Jersey partnership, d/b/a the Atlantis Casino Hotel, Plaintiff,

v.

FIRST FIDELITY BANK, N.A., SOUTH JERSEY, Defendants.

Bankruptcy No. 85–06058.
Adv. No. 86–0043.

United States Bankruptcy Court, D. New Jersey.

Dec. 16, 1986.

See also, 66 B.R. 743.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Paul R. DeFilippo, Newark, N.J., for Elsinore Shore Associates.

Scheider & Wiener by Jeremy Galton, Newark, N.J., for First Fidelity Bank, N.A., South Jersey.

Valore, McAllister, Westmoreland, Gould Vesper & Schwartz by Eric A. Browndorf, Northfield, N.J., for Unsecured Creditors Committee.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

The debtor, Elsinore Shore Associates, f/k/a Playboy Elsinore Associates, a New Jersey partnership, d/b/a The Atlantis Casino Hotel, (ESA), has filed a motion for reconsideration of this Court's denial of ESA's motion for summary judgment on the First Count of its Complaint against First Fidelity Bank, N.A., South Jersey (First Fidelity Bank) and for other relief seeking in the alternative entry of summary judgment on the First Count of the Complaint compelling turnover of the sum of $545,000.00 by the defendant First Fidelity Bank, to ESA, alternatively, partial summary judgment on Count One of the complaint in the amount of $545,000.00, or such sum as the court may determine should be turned over to ESA due to the absence of any right of setoff by First Fidelity Bank, an order pursuant to Fed.R. Civ.P. 56(d) and Bankruptcy Rule 7056 specifying those genuine issues of material fact which exist for purposes of trial, and for a preemptory trial date on all issues not resolved by summary judgment.

· First Fidelity Bank has concurrently moved for the entry of an order compelling ESA to exonerate First Fidelity Bank from liability under a certain letter of credit issued by First Fidelity Bank on behalf of the debtor in favor of American Home Assurance Company (American Home) by payment of $379,405.00, which American Home has demanded or if American Home draws down on Letter of Credit No. 1219/85, an order allowing First Fidelity Bank to pay American Home $379,405.00 and to setoff against the obligation owed by First Fidelity Bank to the debtor, the sum of $379,405.00 paid by First Fidelity Bank to American Home.

ESA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978 as amended by The Bankruptcy Amendments and Federal Judgeship Act of 1984 (Bankruptcy Code) on November 14, 1985.

On October 12, 1980, Playboy-Elsinore Associates (PEA), ESA's predecessor, applied to First Fidelity Bank for the issuance of an irrevocable letter of credit in the amount of $50,000.00 in favor of Insurance Company of North America (INA). Playboy-Elsinore Associates at that time executed a guaranty of payment to First Fidelity Bank for its reimbursement obligations in the event the letter of credit was drawn upon. On October 24, 1980, First Fidelity Bank issued an Irrevocable Letter of Credit, No. 1075, in the amount of $50,000.00 in favor of INA. That letter of credit has a current expiration date of October 26, 1986.

On December 10, 1984 the debtor, ESA, applied to First Fidelity Bank for an irrevocable letter of credit in favor of American Home. At that time the debtor executed a guaranty of payment in favor of First Fidelity Bank agreeing to pay First Fidelity Bank in the event the letter of credit was drawn upon. On January 28, 1985 ESA obtained an Irrevocable Letter of Credit, No. 1219/85 from the Bank in the amount of $490,000.00 in favor of American Home. That letter of credit has a current expiration date of December 31, 1986.

Pursuant to the terms of Letter of Credit No. 1219/85 and Letter of Credit No. 1075, if either of the beneficiaries draw upon the Letters of Credit, in accordance with the terms of the respective letters of credit, First Fidelity Bank is obligated to honor and pay the drafts as presented. The Irrevocable Letter of Credit No. 1219/85 dated January 28, 1985 naming American Home as beneficiary provided:

We [First Fidelity Bank N.A., South Jersey] do hereby issue in your favor this Irrevocable Letter of Credit for the account of Elsinore Shore Associates for a sum not exceeding a total of Four Hundred Ninety Thousand Dollars and 00/100 ($490,000.00) available by your draft(s) at sight.

Drafts must be drawn and presented to us no later than December 31, 1985. All drafts must be marked "Drawn under First Fidelity Bank, National Association, South Jersey, Credit No. 1219/85, dated January 28, 1985.

All drafts must be accompanied by (a) a statement to the effect that your account is over 30 days past due, (2) you are satisfying the account through presentation of the draft, and (3) you have provided a notice of cancellation and demand for payment which has not been satisfied within the 10 day period specified.

The "Irrevocable Letter of Credit" No. 1075 dated October 24, 1980 naming INA as beneficiary, provided:

At the request of Playboy-Elsinore Associates, we [First National Bank of South Jersey, predecessor to First Fidelity Bank] hereby authorize you to draw on First National Bank of South Jersey of Pleasantville, NJ up to an aggregate amount of U.S. Fifty Thousand and 00/100 dollars ($50,000) available by your drafts at sight accompanied by a statement to the effect that you have been called upon to make payment of loss, attorney's fees or other expenses by reason of executing Atlantic City Performance Bond(s) as surety on behalf of Playboy-Elsinore Associates as principal and in favor of Atlantic City, NJ as obligee in the penalty of U.S. Fifty Thousand and 00/100 dollars ($50,000) and dated on or about the 24th day of October 1980, or that the premium(s) thereon are unpaid and overdue.

ESA had also obtained an Irrevocable Letter of Credit dated January 28, 1985 from First Fidelity Bank in favor of Atlantic City Electric Co., No. 1218/85, in the amount of $150,000 and an Irrevocable Let-

ter of Credit dated June 27, 1985 from First National State Bank of South Jersey, a predecessor to First Fidelity Bank in favor of South Jersey Gas Co., No. 1239/85 in the amount of $70,000. Both of these letters of credit expired on December 31, 1985.

On October 12, 1980 Playboy-Elsinore Associates executed a guaranty of Commercial Letter of Credit to First National Bank of South Jersey (predecessor to First Fidelity Bank) in connection with the INA letter of credit which provided in its Paragraph One:

In consideration of your opening, at the request of the undersigned (PEA) the Commercial Letter of Credit (hereinafter called the "Credit") applied for on the reversed side hereof, it is agreed:

1. As to bills drawn under said Credit payable in United States currency, the undersigned will provide you at your office with United States currency to the amount thereof at least one day prior to the maturity of such bills or any instruments executed in extension or renewal thereof. If any such bills shall be payable at sight, then the undersigned will provide such funds immediately upon receipt of notice of payment.

Paragraph 10 of the guaranty further provided:

Upon demand, the undersigned will deliver, convey and transfer to you as security for the payment and performance of the obligation contained in this guaranty and the payment of any and all other obligations or liabilities of the undersigned to you, collateral security of a value and character satisfactory to you.

On November 27, 1984, ESA executed a Guaranty of Commercial Credit to First National State Bank of South Jersey (predecessor to the Bank) in connection with the American Home letter of credit which contained the identical terms of Paragraph One of the INA guaranty recited above, but struck out the language of Paragraph Ten (10) also recited above.

Similar guaranties were executed by ESA in favor of First National State Bank of South Jersey in connection with the At-

lantic City Electric Company letter of credit and the South Jersey Gas Company letter of credit, those guaranties dated December 10, 1984 and June 4, 1985, respectively.

On October 4, 1985 ESA deposited $775,-000.00 into its general checking account No. 409421 at First Fidelity. On that same day the Bank debited the account for the sum of $765,000.00. The $765,000.00 debit was transferred by the Bank to a daily Repurchase Agreement.

On October 15, 1985 Alan D. Weiner, Esquire, counsel for First Fidelity Bank sent a letter to ESA which stated:

> As requested, this is to confirm the discussion had between yourself, other representatives of Elsinore Shore Associates, and ourselves on October 3, 1985. As we advised you, pursuant to the terms of the applicable letter of credit agreement between First Fidelity Bank, N.A., South Jersey and Elsinore Shore Associates, a demand was made by the bank for the posting of collateral by Elsinore Shore Associates with respect to the outstanding letters of credit issued by the bank on the application of Elsinore Shore Associates. No collateral having been forthcoming, the bank exercised its rights to have the balance of the demand deposit account of Elsinore Shore Associates with the bank, up to the amount of the outstanding letters of credit, held as collateral for the reimbursement obligations of Elsinore Shore Associates with respect to said letters of credit. As further indicated to you at that meeting, any balance of the account over and above the amount of the letters of credit, or any future sums thereafter deposited and increasing the balance of said account would not be held by the bank as collateral, and would accordingly be available for use by Elsinore Shore Associates. If substitute collateral, acceptable to the bank, was pledged in favor of the bank, the credit balance of the account would be released by the bank. If you have any questions, please feel free to contact me.

By letter to First Fidelity Bank's attorney dated October 21, 1985, ESA objected to the Bank holding as collateral amounts deposited in the demand deposit account of ESA up to the amount of the outstanding letters of credit and demanded release of the sum of $710,000.00, representing the American Home letter of credit, the Atlantic City Electric Company letter of credit and the South Jersey Gas Company letter of credit, on the basis that ESA never agreed to posting collateral upon demand by the Bank in connection with those letters of credit.

As of November 14, 1985, the date of the filing of the Chapter 11 petition by ESA, the debtor maintained a demand deposit account with the First Fidelity Bank, No. 409421, in which there was a credit balance in favor of ESA in the amount of $765,-000.00. As of the date of the filing of the Chapter 11 petition, First Fidelity Bank continued to hold the amount of $765,-000.00.

On January 27, 1986, First Fidelity Bank filed a motion in this court to modify and terminate the automatic stay provisions of 11 U.S.C. § 362 so as to permit First Fidelity, without further order of the court, to set-off and/or to foreclose against the credit balance of approximately $765,000.00 in ESA's bank account no. 409421 to satisfy the liabilities of ESA to First Fidelity Bank. On February 27, 1986, a consent order entered into by ESA and First Fidelity Bank withdrawing the motion for relief from the automatic stay was entered by this court. Pursuant to that consent order, First Fidelity Bank turned over to ESA, free and clear of any lien, claim or encumbrance, the sum of $220,000.00 from ESA's account no. 409421. Also pursuant to the consent order, First Fidelity Bank held the balance of the money in account no. 409421 of approximately $545,000.00, and continued to credit interest to the account on a daily basis, subject to further order of this court.

On March 4, 1986, ESA filed the instant complaint against First Fidelity Bank.

In its complaint, ESA asserted that as of that date no drafts had been submitted by

American Home against Letter of Credit No. 1219/85 and that ESA had timely made all insurance premiums due to American Home or its affiliates. ESA further asserted that no draft had been drawn against the INA Letter of Credit No. 1075 as of that date.

ESA stated in its complaint that First Fidelity Bank asserted that the credit balance was collateral for First Fidelity Bank's contingent unliquidated liability under the aforementioned Letters of Credit. ESA contends in its complaint that First Fidelity Bank's actions violated the parties' agreements, were an "intentional conversion" of ESA's property rights, and caused ESA damage.

In its complaint, ESA contends that First Fidelity Bank owes ESA $765,000.00 or such sum as may be represented by the credit balance in account no. 409421. ESA further contends that First Fidelity Bank holds no collateral to secure its claim, and has no right of setoff against the credit balance in account no. 409421.

Under Count One of the complaint ESA seeks judgment against First Fidelity Bank for (1) an order directing the Bank to pay to ESA the sum of $765,000.00, or such credit balance as may exist in favor of ESA held by the Bank; (2) damages based upon the Bank's wrongful retention of ESA's funds and conversion of ESA's property; (3) interest, attorneys fees and other costs of suit, and; (4) other and further relief as the court deems just.

Under Count Two of the complaint ESA seeks a judgment against the Bank (1) to estimate the Bank's contingent, unliquidated claim against ESA pursuant to 11 U.S.C. § 502(c); (2) to determine the extent validity and priority of the Bank's alleged lien, security interest or right of setoff in or against the property of ESA; (3) to determine the Bank's secured claim or right of setoff, if any, and; (4) for such other and further relief as the court deems just.

On March 6, 1986 ESA filed a notice of motion for summary judgment against First Fidelity on Count One of its complaint seeking an order directing First Fidelity Bank to turnover and pay to ESA all funds represented by any credit balances in favor of ESA in any account with the Bank.

On March 6, 1986, ESA filed a brief in support of its motion for summary judgment, together with the certification of Paul R. DeFilippo, Esquire, counsel for ESA, dated March 5, 1986. ESA argued that, pursuant to 11 U.S.C. § 542(b), ESA is entitled to the turnover of all of ESA's monies which are presently being held by First Fidelity Bank. In his certification, Mr. DeFilippo stated that, based upon conversations with First Fidelity Bank's counsel as of that date, First Fidelity Bank has not received or paid a draft against either the INA or American Home letters of credit.

There was also before this court an affidavit of R. Bruce McKee, the Vice President of Finance of ESA. Mr. McKee stated in his affidavit dated April 10, 1986 that to the best of his knowledge, "no drafts have been submitted to or paid by the Bank [First Fidelity] under either of the two open letters of credit."

ESA also relied upon the Certification of Alexander Hertz, Vice President of First Fidelity Bank, which was filed with this court on January 27, 1986 and submitted in support of First Fidelity Bank's motion for relief from the automatic stay. In that affidavit, Alexander Hertz stated that "if any of the Beneficiaries under the Irrevocable Letters of Credit ... draw upon the said letters of credit in compliance with its terms, Bank will be required to honor and pay the drafts so presented." Mr. Hertz further stated that the "debtor has a contingent liability to Bank under the said letters of credit for the amount the Bank is required to honor and pay under the letters of credit."

First Fidelity Bank opposed the motion for summary judgment and argued that it has not been dispositively shown that the beneficiaries of the aforementioned letters of credit had not drawn upon the letters of credit or that the letters of credit will not

be drawn upon in the future. With regard to this issue, First Fidelity Bank argued that: (1) the burden is upon the plaintiff, ESA, in a summary judgment proceeding to show that there exists no issue of material fact, and; (2) any uncertainty must be resolved in favor of the defendant, First Fidelity Bank, in a summary judgment proceeding. First Fidelity Bank further contended that: (1) 11 U.S.C. § 542(b) does not apply to deposit accounts; (2) even if 11 U.S.C. § 542(b) does apply, 11 U.S.C. § 553 gives First Fidelity a right of setoff; (3) ESA's deposit account with First Fidelity Bank is cash collateral which need not be turned over without adequate protection; (4) 11 U.S.C. § 502(c) is not a basis for requiring First Fidelity to return the money on deposit to ESA, and; (5) the consent order entered into between the parties and entered by this court on February 27, 1986 barred the motion for summary judgment.

On April 14, 1986, First Fidelity Bank filed an Answer, Counterclaim and Third Party Complaint with this Court in connection with the pending complaint. First Fidelity Bank has named American Home and INA as third party defendants seeking a declaratory judgment that the liability of First Fidelity Bank to the beneficiaries under the letters of credit is limited to unpaid claims of the beneficiaries based upon the account of the debtor, ESA, existing at the time of the filing by ESA of its Chapter 11 petition. First Fidelity Bank also seeks a declaratory judgment that claims of the beneficiaries existing at the time of the filing of the Chapter 11 petition have been satisfied, and other relief.

A hearing on ESA's original motion for summary judgment was conducted on April 14, 1986. This court at that time reviewed the affidavit of Messrs. DeFillipo and McKee, the certification of Alexander Hertz, and the deposition testimony of Mr. Vincent Ruggierio, the Secretary-Regional Manager of American Home. Based upon that review, this court, in its decision rendered on the record on May 5, 1986, found that the affidavits and limited deposition testimony presented were not dispositive of the material issue of whether ESA currently owes, or owed at the time of the filing of the Chapter 11 petition, or at any time prior thereto, a debt to First Fidelity Bank to which a right to setoff could attach.[1] This court found that the record was equally unclear regarding whether the beneficiaries of the existing letters of credit presented to First Fidelity Bank any drafts for payment which represent premium payments due from ESA, and that such drafts might form the basis of a claim by First Fidelity Bank against ESA which could entitle First Fidelity Bank to a right of setoff pursuant to 11 U.S.C. § 553.

Based upon those findings, the court, by its decision rendered on May 5, 1986, denied the debtor's motion for summary judgment.

An order dated June 16, 1986 was entered denying the motion. No appeal from that order was taken. Instead, on May 30, 1986 ESA filed its instant motion for recon-

1. In his deposition conducted on April 14, 1986, Mr. Vincent Ruggierio, stated that he was a secretary-regional manager of American Home. *See* Deposition Testimony of Ruggierio, p. 3. He stated that American Home had not yet billed ESA for approximately $341,946.00, which amount represents premiums due. *See* Deposition Testimony of Ruggierio, pp. 14, 18–19. The deposition testimony of Mr. Ruggiero failed to conclusively demonstrate whether First Fidelity is "owed" a debt by ESA because American Home has not drawn down on its letter of credit. Counsel for ESA relied upon a stipulation by counsel for Mr. Ruggierio during the course of his deposition that American Home had not issued a draft pursuant to the letter of credit, and had not sent to ESA either a state-

ment that the account is 30 days past due or a notice of demand for payment. *See* Deposition Testimony of Ruggierio, pp. 70–71. Mr. Ruggierio testified only that if a draw against the letter of credit had been made by American Home, he "probably" would be aware of it. *See* Deposition Testimony of Ruggierio, p. 76. Mr. Ruggiero further stated at the deposition that billings are sent not through his office in New York City, but through the American Home accounting department at another location. *See* Deposition Testimony of Ruggierio, pp. 13, 31.

More critically, no affidavits or depositions of officers of the third party defendant, INA, were timely presented regarding claims that the beneficiary might have against ESA by way of draw down on its letter of credit or otherwise.

sideration and other relief. On June 5, 1986, First Fidelity Bank filed its motion seeking an order of exoneration and to permit setoff.

The motion by the debtor seeks alternative relief under Fed.R.Civ.P. 56(d), 59(e) and 60(b).

Fed.R.Civ.P. 60, made applicable to bankruptcy proceedings by Bankruptcy Rule 9024, provides for relief from a judgment or order and provides in pertinent part:

**(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28 U.S.C. § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature

of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action. (As amended Dec. 27, 1946, eff. Mar. 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949.)

Federal R.Civ.P. 59, made applicable to bankruptcy proceedings by Bankruptcy Rule 9023, provides for New Trials and Amendment of Judgments, and provides in pertinent part:

(e) *Motion to Alter or Amend a Judgment.*

A motion to alter or amend the judgment shall be served not later than 10 days after entry of judgment.

This court finds that ESA has failed to establish grounds set forth in Rules 59 and 60(b) to form the basis for this court to reconsider its decision of May 5, 1986 based upon the record as it was presented by the parties at that time. ESA has shown no mistake, inadvertence, surprise or excusable neglect, newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Fed.R.Civ.P. 59(b), fraud, misrepresentation, misconduct of an adverse party or other grounds to justify such relief.

ESA seeks alternative relief. ESA has moved again for summary judgment or partial summary judgment on Count One of its complaint while First Fidelity Bank now seeks an order permitting setoff based upon its payment of a draft submitted pursuant to the American Home letter of credit.

The court in connection with these applications makes the following additional findings of fact based upon the record as supplemented by the parties to date.

On April 24, 1986 INA filed an answer to the Third Party Complaint filed by First Fidelity Bank wherein INA admitted that it had issued surety bonds to ESA, and that the INA letter of credit was issued to insure timely payment of premiums due on the bonds and to guarantee payment of loss, attorneys' fees and other expenses to INA on account of the performance and

maintenance bonds. INA further admitted that ESA had paid the premium prior to the filing of the Chapter 11 petition, but that the maintenance bond has not been released so that INA could be called upon to make payment under the bond in which case it would seek reimbursement from the subject letter of credit.

INA further claimed by separate defenses that the affirmative pleading failed to state a claim upon which relief can be granted and that the claim was barred as a matter of law.

On May 6, 1986 American Home also filed an answer to the Third Party Complaint seeking dismissal of the Third Party Complaint on the grounds that it fails to state a claim upon which relief can be given, this court lacked jurisdiction over the complaint because the facts alleged have not ripened into a case or controversy, and that the Third Party Plaintiff (First Fidelity Bank) should be barred as to remedy and relief by the doctrine of estoppel.

In connection with the motion for reconsideration of the denial of summary judgment, ESA submitted an affidavit of R. Bruce McKee, the Vice President of Finance of ESA. By Mr. McKee's Affidavit, he stated that as of May 27, 1986, the date of the Affidavit, ESA has not been presented with any invoices or billings from American Home or its affiliates for premiums due under any insurance policies issued by American Home or its affiliates for the policy year ending October 31, 1985 or December 31, 1985, other than the invoice for deposit premium which has been paid. McKee also stated that ESA had not received any notice from American Home or its affiliates that any insurance policies issued by American Home or its affiliates are to be cancelled. McKee further averred that as of the date of his affidavit, ESA had not received any notice from First Fidelity Bank that the Bank had been presented with or made any payment of any drafts under any outstanding letters of credit issued for the account of the debtor.

Mr. McKee, by subsequent Affidavit dated June 13, 1986, however, stated that on June 9, 1986, ESA received a retrospective premium billing in the amount of $379,-405.00 from Walter Kaye Associates, agents for American Home, for premiums due under the insurance policies issued by American Home or its affiliates.

In an Affidavit of Jeremy Galton, Esquire, counsel for First Fidelity Bank, dated June 3, 1986, Mr. Galton states that on May 21, 1986, he received from counsel for American Home a copy of American Home's retention adjustment for ESA that indicates a premium due and payable of $379,405.00.

Alexander Hertz, Vice President of First Fidelity Bank, by Affidavit dated June 27, 1986, states that on June 19, 1986, American Home submitted to the bank a documentary draft for $379,405.00 on demand to the order of American Home under Letter of Credit No. 1219/85. That draft was rejected. A second draft in the same amount was submitted to the Bank on June 25, 1986, with supporting documentation. On July 1, 1986 First Fidelity Bank paid the draft under the letter of credit. Mark F.C. Berner, Esquire, counsel for American Home has advised counsel for ESA that the $379,405.00 retention adjustment billing is the maximum amount which will be claimed by American Home under existing policies as additional or retrospective premiums.

Subsequent to the close of the last hearing, by Affidavit dated April 25, 1986, Ronald Tucker, a bond underwriting manager for INA filed an affidavit with this court stating that INA had issued performance and maintenance bonds to Playboy-Elsinore Associates, predecessor to ESA, as of the date of the affidavit, the maintenance bond in the amount of $79,000.00 had not been released by the Obligee, City of Atlantic City, and that until a full and complete release is received from the City of Atlantic City, the City could assert a claim under the bond. Mr. Tucker further stated that if a claim were asserted by the City, INA would draw down on the irrevocable letter of credit and that until a full release was received by the City, INA would not consent to the release of the letter of credit.

Mr. Galton, counsel for First Fidelity Bank, stated to this court at the hearing on the instant motions on July 2, 1986 that there were no drawn-downs on the INA Letter of Credit. The Bank through its counsel further stated that it intended to terminate that Letter of Credit effective in October 1986.

Since First Fidelity Bank at the time of the July 2, 1986 hearing had already paid the draft under the American Home Letter of Credit, its motion for exoneration was rendered moot. First Fidelity Bank, however, urged the alternative relief requested in its motion, that the Bank be allowed to setoff the amount paid by the Bank to America Home in the sum or $379,405.00 against ESA's account.

This court, by order dated July 23, 1986 ordered that the $379,405.00 billing from American Home to ESA was the maximum amount of retrospective premium adjustment which may be claimed by American Home under any or all of its policies, that on July 1, 1986, First Fidelity Bank paid the draft submitted by American Home under Letter of Credit No. 1219/85 in the sum of $379,405.00 which satisfied in full First Fidelity Bank's liability and obligation to American Home under the Letter of Credit, that payment of the aforesaid draft by First Fidelity Bank extinguished American Home and its affiliates' claims against ESA under the subject insurance policies. American Home by the July 23, 1986 order was directed to forthwith return the original Letter of Credit No. 1219/85 to First Fidelity Bank. The court ordered that upon return of the original Letter of Credit No. 1219/85 to First Fidelity Bank, First Fidelity Bank pay or release to ESA the sum of $115,595.00 from ESA's Account No. 409421, and that the balance of funds maintained in ESA's Account No. 409421, in the approximate sum of $429,405.00 representing the sum of $379,405.00 claimed as a setoff by First Fidelity Bank and the sum of $50,000.00 representing the face amount of the INA letter of credit, be held by First Fidelity Bank pending this court's decision on ESA's claims for turnover and the Bank's request for setoff against those funds.

The purpose of summary judgment is to avoid a trial which is unnecessary and results in delay and expense by promptly disposing of any actions in which there is no genuine issue of material fact. *Tomalewski v. State Farm Life Insurance Company*, 494 F.2d 882, 884 (3d Cir.1974). Summary judgment is a "drastic remedy" which is not to be granted liberally. *Id.* cited *with approval in Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a trial court may enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally, Hollinger v. Wagner Mining Equipment Company*, 667 F.2d 402, 405 (3d Cir.1981). In a motion for summary judgment, any factual disputes, and any inferences to be drawn from underlying facts, must be resolved against the moving party and in favor of the party opposing the motion. *Id.* at 405; *Chirinos de Alvarez v. Creole Petroleum Corporation*, 613 F.2d 1240, 1244 (3d Cir.1980). The party moving for summary judgment, ESA, has the burden of demonstrating that there exists no genuine issue of material fact. *Fairbanks, Morse & Company v. Consolidated Fisheries Company*, 190 F.2d 817, 824 (3d Cir.1951).

The resolution of the issue in the present case involves an examination of several sections of the Bankruptcy Code. Section 362(a) of the Bankruptcy Code provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could

have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

Bankruptcy Code § 542(b) provides in relevant part:

an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of the this title against a claim against the debtor.

Bankruptcy Code § 553 provides:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed other than under section 502(b)(3) of this title:

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition:

(B) while the debtor was insolvent: and

(C) for the purpose of obtaining a right of setoff against the debtor.

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 365(h)(2) or 365(i)(2), of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

(c) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

By the express terms of Section 553, the right of setoff is limited by the automatic stay provisions of Section 362. *See United States on Behalf of I.R.S. v. Norton,* 717 F.2d 767, 771 (3d Cir.1983).

The funds deposited by ESA with First Fidelity Bank in the debtor's general checking account no. 409421 prior to the filing of the debtor's Chapter 11 petition became property of the Bank and the debtor became a creditor of the Bank for the amount of the deposit. *See American Lumberman's Mutual Casualty Company v. Bradley Construction Co.,* 127 N.J.Eq. 500, 13 A.2d 783 (Ch. 1940), *aff'd* 129 N.J.Eq. 278, 19 A.2d 242 (Ct. E & A 1941); *Federal Deposit Insurance Corporation v. Pioneer State Bank,* 155 N.J.Super. 381, 389, 382 A.2d 958 (Law Div.1977).

It is not disputed for purposes of these motions that the deposit at issue at First Fidelity Bank created a debtor-creditor relationship between First Fidelity Bank and the debtor, ESA, as depositor, so that a debt was owed by the Bank to ESA in the amount of the funds deposited at the Bank prior to the filing of the Chapter 11 petition and at all relevant times thereafter.

The critical issue presented to the court herein is whether First Fidelity Bank holds a mutual pre-petition claim against the debtor that is cognizable under 11 U.S.C. § 553 so that the pre-petition debt owing by the Bank to ESA can be offset against a pre-petition claim of the Bank against the debtor.

The threshold issue which the court must examine in any request for a setoff is whether there is mutuality of obligation between the debtor and the creditor. The debt and the claim need not rise out of the same transaction since the test is mutualty, not similarity, of obligation. The debt and claim is not required to be of the same character before the principle of setoff may be applied. Pre-petition obligations may be setoff one against the other. There also exists authority for the concept of setoff to apply to mutual post-petition obligations. A post-petition obligation, however, may not be setoff against a pre-petition obligation of the debtor, because there is no mutuality of obligation. *In re Hill,* 19 B.R. 375, 380 (Bkrtcy.N.D. Tex.1982).

The word claim has been defined in the Bankruptcy Code pursuant to 11 U.S.C. 101(4)(A) and (B):

(4) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Factors which make a claim contingent have been discussed by the courts in the Third Circuit as well as in other circuits. In the case of *Matter of M. Frenville Company, Inc.,* 744 F.2d 332, 336 n. 7 (3d Cir.1984), *cert. denied* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), the court stated, "[b]ankruptcy judges have defined a contingent claim as a claim which becomes due only on the occurrence of a future event. *See e.g., In re Dill,* 30 B.R. 546, 549 (Bkrtcy. 9th Cir.1983), *aff'd.* 731 F.2d 629 (9th Cir.1984). One frequently cited definition of contingent is that 'claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event.' *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bkrtcy.S. D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir. (Unit A) 1981) (per curiam)." The court in *Frenville* looked to the statutory history of the definition of claim and noted, "the bill

contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court." 744 F.2d at 336, *citing* H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5963, 6266; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5787, 5807–08 (virtually identical statement).

In *Frenville,* an accounting firm, A & B, was engaged by the debtor for several years, 1977 to 1979, as an independent auditor and accountant. As part of its duties, A & B prepared certified financial statements for fiscal years 1978 and 1979 for the debtor, M. Frenville Co., Inc. (Frenville). In July of 1980, creditors of Frenville filed an involuntary petition in bankruptcy against the company under Chapter 7 of the Bankruptcy Reform Act of 1978. Several banks filed suit in the Supreme Court of New York on November 16, 1981, against A & B alleging that A & B negligently and recklessly prepared the Frenville financial statements, that the statements were false and because of their reliance on these statements, the banks had suffered losses. Two of the principals of the company, Rudolph Frenville, Sr. and Rudolph Frenville, Jr. (the Frenvilles) also had involuntary bankruptcy petitions filed against them under Chapter 7 in January of 1981. As a result of this suit by the banks, A & B filed a complaint on January 10, 1983 in the bankruptcy court seeking relief under the automatic stay provisions of section 362(a) in order to include the Frenvilles as third party defendants in the New York state proceeding. The court stated that the issue was whether the automatic stay was applicable where the debtor's acts which formed the basis of a suit occurred pre-petition but the actual cause of action which was being instituted did not arise until after the filing of the bankruptcy petition. *Id.* at 334. Reversing the district court, the Court of Appeals held that the automatic stay did not apply in this situation. The court looked to New York law to ascertain at what point in time A & B's claim against the Frenvilles arose. The Third Circuit determined that according to New York law, the claim for contribution or indemnification did not accrue at the time of the commission of the underlying act, but rather at the time of the payment of the judgment flowing from the act. *Id.* at 337. The court noted, however, "the present case is different from one involving an indemnity or surety contract. When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement." *Id.* at 336.

In the case of *In re Flanagan Brothers, Inc.,* 47 B.R. 299 (Bkrtcy.D.N.J.1985) the bankruptcy court addressed the issue of a contingent claim, in the context of a setoff. In *Flanagan,* the debtor had filed a petition under Chapter 7 of the Bankruptcy Code. Prior to filing the petition, Don Rodgers, Inc. (Rodgers) executed a contract with the City of Bridgeton, New Jersey, whereby Rodgers agreed to undertake a certain construction project in that municipality. Under the terms of the contract and New Jersey law, Rodgers obtained a performance bond from a surety for protection of all the parties supplying labor and materials for a construction project. Rodgers subcontracted a portion of the project to the debtor who purchased electrical components from Billows Electric Supply Company (Billows). Under the two contracts, Rodgers owed the debtor $18,520.92 and Billows asserted a claim against the debtor of $22,270.45. Bankrupcy Judge Emil F. Goldhaber stated that, "[t]he predominate issue presented in the case before us is whether a general contractor, who under applicable law is a surety for all persons furnishing labor and material on a state building project, may set-off its entire debt to the debtor/subcontractor against the claim of a materialman who supplied goods to the debtor, rather than set-off only a portion of its debt which equals the amount of a dividend the materialman would receive in the bankruptcy proceeding." 47

B.R. at 300. The court noted that if Rodgers were to satisfy its obligation to Billows, it would be subrogated to Billows' right to receive payment from the debtor and since Rodgers and the debtor would each owe a debt to the other, setoff was essentially appropriate. *Id.* at 301. The sum which the debtor owed to Billows was being litigated in the federal district court and held in abeyance pending a resolution of the matter in the bankruptcy court. The court noted that although the amount of the debtor's liability to Billows was not yet fixed, the parties were apparently in agreement that some amount was owing. *Id.* at 301 n. 3. The court also noted that Rodgers had not yet satisfied Billows' claim and it would be only after acquiring this claim against the debtor that Rodgers would be in a posture to setoff. *Id.* The court noted, however, that, "Rodgers, a surety for the debtor's obligations on the project according to state law, is thus liable directly to Billows on its claim, as well as being indebted indirectly to Billows through its indebtedness to the debtor." *Id.* at 303. The court held, therefore, that in the event that Rodgers paid Billows' claim, Rodgers would be allowed to setoff that sum against its indebtedness to the debtor. *Id.*

In the case of *In re Philip Semmer Glass Company,* 135 F. 77 (2d Cir.1905), *appeal dismissed sub nom Conboy v. First National Bank of Jersey City,* 203 U.S. 141, 27 S.Ct. 50, 51 L.Ed. 128 (1906), the Second Circuit, construing Section 68 of the prior Bankruptcy Act, held that a bank which held promissory notes of the bankrupt on the day of adjudication in bankruptcy need not surrender a deposit balance standing to the credit of the bankrupt on the day of the adjudication in bankruptcy but could set it off against said notes and prove the amount remaining due after such setoff. The court held that even if the notes had not matured and the bankrupt was the indorser, not the maker, the word debt, as used in Section 68, included, "any debt, demand or claim provable in bankruptcy." 135 F. at 77.

Another case construing setoff where the debt owed was not due at the time of the filing of the petition is *Matter of Isis Foods, Inc.,* 24 B.R. 75 (Bkrtcy. W.D.Mo. 1982). In that case, Isis Foods, Inc. filed a Chapter 11 petition on January 22, 1982 and Isis Leasing Incorporated filed a Chapter 11 petition on February 22, 1982. On July 1, 1982, the two cases were consolidated. Prior to the filing of either petition, on June 19, 1981, Isis Leasing Incorporated had executed an installment note to Trader's Bank of Kansas City, the plaintiff, in the amount of $66,931.20, which note was unconditionally guaranteed by Isis Foods, Inc. At the date of the filing of both petitions, the note was not in default. However, after the filing of the petition, no installment payments were tendered. Subsequently, the Bank brought an action for setoff at which time the balance currently due under the installment loan was $46,773.68 excluding interest. As of January 22, 1982, the date of filing of the voluntary bankruptcy, Isis Foods, Inc. had maintained a checking account with the plaintiff and the deposit at that time was $15,078.63. The trustee took the position that the bank had no right of setoff because it had no claim before the commencement of the case. The court noted that it was patent law on the issue of setoff that, " 'the right of setoff may be asserted in the bankruptcy case even though at the time the petition is filed one of the debts involved is *absolutely owing but not presently due,* or where a definite liability has accrued but is as yet unliquidated. Nor is it necessary that the debt sought to be setoff be due when the case is commenced.' " 24 B.R. at 76, *citing* 4 Colliers on Bankruptcy para. 553.10(2), pp. 553–49, 553–50 (1982). The bankruptcy court noted that in this case, there was no question about the existence of the debt and that it was absolutely owing, albeit as yet unmatured. The court stated, "[a]lthough it has sometimes been held that a bank may not exercise a prebankruptcy setoff with respect to unmatured claims against the debtor, a postbankruptcy setoff with respect to an unmatured claim has been approved as a matter of hornbook law." 24 B.R. at 76–77.

The granting of a right of setoff rests with the broad, equitable discretion of the court. *United States on Behalf of IRS v. Norton,* 717 F.2d 767, 772 (3d Cir.1983); *Matter of Isis Foods, Inc.,* 24 B.R. 75, 77 (Bkrtcy.W.D.Mo.1982). Policy reasons sometimes argue against the granting of the right of setoff. For instance, in *McCollum v. Hamilton National Bank of Chattanooga,* 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938), the trustee sought to recover from the defendant bank a penalty in violation of the usury laws of the State of Tennessee. The Tennessee State Court had held that the trustee should have twice the interest rate in judgment against the bank. The bank responded that the bankrupt owed it money on notes and prayed that it be allowed to setoff its claim against any judgment that the trustee obtained. The United States Supreme Court upheld the state court's judgment that the bank had been guilty of usury but reversed the state court's finding that a setoff was appropriate. The court noted that a setoff would defeat the purpose of the state statute in which punishment was definitely prescribed. The court distinguished this debt from a debt which is owed in contract, stating "[l]iability for the penalty does not arise in contract but is laid in invitum as a disciplinary measure." 303 U.S. at 249, 58 S.Ct. at 571.

In *Cooper-Jarrett, Inc. v. Central Transport, Inc.,* 726 F.2d 93 (3d Cir.1984), the Third Circuit refused to allow a creditor to setoff its claim against the debtor for unpaid freight charges against the amount it owed the debtor as a result of a settlement agreement reached post-petition outside of the bankruptcy court. The facts of *Cooper-Jarrett* are that in June of 1979, the creditor, Central Transport, Inc. (Central), entered into a contract to buy certain operating rights granted by the Interstate Commerce Commission (ICC) and owned by the debtor, Cooper-Jarrett, Inc., for $150,000.00. Thereafter, Congress deregulated the trucking industry which enabled any common carrier to get operating authority directly from the ICC and which greatly reduced the value of existing operating rights. Central refused to sign the purchase agreement and Cooper-Jarrett sued Central in the United States District Court for the District of New Jersey. In December of 1981, while the contract action was still pending, Cooper-Jarrett filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The bankruptcy court pursuant to an order entered February 17, 1982, lifted the automatic stay and permitted Cooper-Jarrett's contract action to proceed in district court. In the bankruptcy proceedings, Central had filed a claim of $19,165.75 for pre-petition unpaid freight charges. Central did not, however, raise this as a counterclaim in the district court action. In December of 1982, the parties settled the district court action with the agreement that Central was to pay the debtor $70,000.00 in return for dismissal of the lawsuit. Again, the issue of the claim of Central for the pre-petition freight charges was never mentioned in the settlement negotiations. After the district court dismissed the action, Central asserted the right pursuant to 11 U.S.C. § 553 to credit the freight charges debt allegedly owed by Cooper-Jarrett to Central against the $70,000.00 owed by Central to Cooper-Jarrett under the settlement agreement. District Judge Frederick B. Lacey writing for the district court held the settlement agreement was a post-petition obligation and thus could not be setoff and the court of appeals affirmed. The Third Circuit noted that the district judge's, "reasoning is in accord with general principles governing settlement agreements, since a settlement 'extinguishes those legal rights [which the party] sought to enforce through litigation in exchange for those rights secured by the contract.' *Village of Kaktovik v. Watt,* 689 F.2d 222, 230 (D.C.Cir.1982). *See also, Protective Closures Company v. Clover Industries, Inc.,* 394 F.2d 809, 812 (2d Cir. 1968)." 726 F.2d at 96. The court held, therefore, that "Central's pre-petition contract obligation of $150,000.00 was supplanted by its post-petition settlement obligation. Since § 553 explicitly limits the claims against which a creditor can claim

an offset to a 'debt owing by such creditor to the debtor that arose before the commencement' of the Title 11 petition, and the debt which Central owed Cooper-Jarrett under the settlement agreement arose thereafter, the district court correctly concluded that there was no right of setoff under Section 553." 726 F.2d at 96–97.

One court has distinguished an absolute but contingent liability from an unliquidated and uncertain liability occurring after the date of the petition, holding that in the latter situation, a setoff cannot be granted. *See Matter of American Motor Home Rentals*, 10 B.R. 53, 57 n. 11 (Bkrtcy.W.D.Mo.1981). In *American Motor Home*, the trustee in bankruptcy sought to recover money which the defendant had listed as credits to the debtor on a certain account with the debtor, who was a salesman for the defendant. The money credited was held in a dealer reserve account designated as the Hold Reserve Account by the defendant. After a review of the contract provisions, the bankruptcy court held that any excess amount in the Hold Reserve Account over $4,000.00, as of the 25th of any month, were to be paid to the debtor and thus the trustee could recover that amount.

The defendant had counterclaimed that even if this money was due and owing, it was entitled to a setoff on account of a $13,500.00 loss which it had sustained on the repossession and resale of a mobile home which had been sold by the debtor to certain third parties, Robert E. Bair and Janet M. Bair. The defendant claimed the debtor had made misrepresentations to the third parties which had exposed the defendant to liability for claims made by the third parties. The defendant had made a settlement with the third parties and sold the unit privately at a loss of $13,500.00. The court held, however, "there was no direct evidence of any misrepresentation of the debtor to the Bairs which resulted in the $13,500.00 loss in this regard. All that was shown by the defendant in this regard is that it repossessed the Bair unit and resold it at a loss of $13,500.00." *Id.* at 55. The court concluded that, "[f]or failure of the

defendant to offer evidence in the face of an offer to do so afforded by the court, this claim of a right to setoff must be denied." *Id.* at 56.

In the case of *In re Morristown Lincoln-Mercury, Inc.*, 42 B.R. 413 (Bkrtcy.E.D.Tenn.1984), also involving a dealer reserve account, the court held that a bank could offset money it owed the debtor from this account against claims owing by the debtor arising out of pre-petition agreements, even though certain of these claims were contingent when the petition was filed. On certain of the bank's claims, the trustee asserted in *Morristown* that the ultimate liability on the part of the debtor was attributable to post-petition events and, therefore, those claims were not property subject to setoff against the dealer reserve account. The court noted the trustee relied on the case of *American Motor Home Rentals, supra,* in support of his argument. The court in *Morristown* distinguished *American Motor Home Rentals,* noting that in that case the creditor, "failed to establish the validity of its claims underlying its asserted setoff right." 42 B.R. at 417. The *Morristown* court agreed that § 553 clearly prohibited a setoff of a post-petition claim against a debtor's pre-petition liability but stated, "[h]owever, Code § 553 does not prohibit setoff of a creditor's claim arising prepetition, unliquidated or unmatured as of the petition date, against a debtor's prepetition claim. [citations omitted] Furthermore, a contingent claim which arises prior to the commencement of a bankruptcy case may be setoff against a prepetition claim of the debtor's estate." *Id.* at 417–18. The court in *Morristown* held that setoff on all the bank's claims were allowable, concluding:

all seven of the Bank's claims against the debtor arose from prepetition agreements between the Bank and the debtor. As of the petition date the debtor was liable to the Bank on each of its claims. The character of a claim is not transformed from prepetition to postpetition simply because it is contingent, unliqui-

dated, or unmatured when the debtor's petition is filed.

*Id.* at 418–19.

There are a number of cases involving government agencies where the agencies' claimed right of setoff has been denied. For instance, in *In re Howell,* 4 B.R. 102 (Bkrtcy.M.D.Tenn.1980), the Department of Labor sought to offset overpayments made to the debtor against future disability benefits under the Federal Employees' Compensation Act. The court concluded that setoff was not appropriate because the amount of setoff is limited to funds available at the time of filing the petition and cannot be asserted against future, unmatured payments due to the debtor. *Id.* at 108.

Similarly, in *In re Rowan,* 15 B.R. 834 (Bkrtcy.N.D.Ohio 1981), *aff'd* 747 F.2d 1052 (6th Cir.1984), the bankruptcy court in a decision affirmed by the Sixth Circuit Court of Appeals held that the Social Security Administration could not utilize the right of setoff to recoup overpayments to the debtor from future benefits due the debtor. The bankruptcy court found that on January 12, 1981, when the petition was filed, there was no fund held by the agency against which it could offset the debt owed to it because the debtor was not yet entitled to receive payment since he had not yet survived the month. The bankruptcy court stated:

> As the fund against which the right of setoff is to be exercised must be in existence as of the commencement of the case, 11 U.S.C. § 553(a), the right of setoff could not be utilized herein.

15 B.R. at 840.

In *In re Hill,* 19 B.R. 375 (Bkrtcy.N.D. Tex.1982), the bankruptcy court held that the Farmer's Home Administration (FmHA) violated the automatic stay by setting off post-petition money due the debtor who was a farmer, against his debt to the FmHA. In *Hill* the debtor was indebted to FmHA on at least four notes secured by liens against real estate and personal property. The debtor filed a Chapter 11 petition on February 24, 1981, and the court

found that FmHA had actual knowledge of this filing. Under another agency of the United States Department of Agriculture, the Agricultural Stabilization and Conservation Service (ASCS), farmers were entitled to receive disaster payments resulting from prevented planting or low-yield and payments representing the difference between the target price and the actual market price of the crop. Whether any monies would be due to farmers under this program could not be determined until late in each crop year. Therefore, in late November or early December of 1981, notice was circulated by the ASCS concerning the prospects for funding of deficiency payments to eligible producers. *Id.* at 377. The Department of Agriculture had promulgated regulations which permitted other agencies of the Department to make demand upon ASCS for setoffs to recover indebtedness owed to those agencies. *Id.;* *See,* 7 C.F.R. § 13.1 et seq. Following these regulations, on December 3, 1981, FmHA sent a "Request for Setoff" to ASCS, requesting an involuntary setoff of any ASCS monies which the debtor might be entitled to apply against monies which the debtor owed to the FmHA. The bankruptcy court held that since the prerequisites for determination of entitlement to ASCS money occurred near harvest time, in this case more than nine months after the bankruptcy petition was filed, the amounts due the debtor were post-petition monies which could not be setoff against a pre-petition indebtedness. 19 B.R. at 380.

Rather than focusing on the nature of the claim of the creditor, the courts in *Howell, Hill,* and *Rowan,* appear to focus on the fact that there was no "fund" existing at the time of the bankruptcy petition against which a creditor may offset its claim.

Courts have also held that a right to offset should be denied in the case of a tax refund due the debtor by the Internal Revenue Service (IRS). For instance, in *United States on Behalf of IRS v. Norton,* 717 F.2d 767 (3d Cir.1983), the debtors filed a petition under Chapter 13 of the Bankrupt-

cy Code on October 2, 1980. In their plan, the debtors scheduled the IRS as the holder of a priority tax claim with respect to deficiencies for 1978 in the amount of $762.00. Their plan stipulated for payment in full of that claim over a three-year period. Before the plan was confirmed on April 23, 1981, the debtors filed an income tax return for 1980 which showed that they were entitled to a refund of $2,052.78. Although the IRS refunded $1,314.81, they retained $737.97 on account of the debtors' 1978 tax liability. The Third Circuit upheld the holding of the bankruptcy court that the IRS was not entitled to retain the $737.97 and ordered that that sum be returned to the debtors. *Id.* at 769. The court noted that the language of § 553 was permissive and not mandatory and its application when properly invoked, rested in the discretion of the court under general principles of equity. *Id.* at 772. The court noted that the IRS had failed to object to the Chapter 13 plan and also that its claim would be satisfied in full under the plan. *Id.* at 774. In *Norton*, as in the prior cases involving government agencies, no "fund" existed at the time of the filing of the petition, although the refund due did, in part, cover several months after the filing of the petition for the particular tax year.

A similar case is *United States v. Reynolds*, 764 F.2d 1004 (4th Cir.1985). In *Reynolds*, the debtors filed a joint Chapter 13 petition on October 30, 1980. Approximately two months earlier, on August 16, 1980, the debtors had filed a tax return which was delinquent for the taxable year 1979 and which showed an amount due of $1,343.80 which was not paid. On December 2, 1980, the debtors' Chapter 13 plan was confirmed without an objection from the IRS. The plan provided for payment of the IRS claim as a priority claim. On August 6, 1981, the debtors filed a joint tax return for the tax year 1980 which showed a refund due of $2,024.99. The IRS remitted only $348.35, retaining $1,681.96, which the IRS asserted represented the portion of the refund allocable to the period prior to the filing of the petition. *Id.* at 1005. The *Reynolds* court, relying on the opinion in

*United States on Behalf of IRS v. Norton, supra*, concluded that the action of the IRS in retaining the debtors' refund, "was a setoff subject to the automatic stay and that the IRS violated the stay in retaining the funds." 764 F.2d at 1007. As in *Norton*, there was no "fund" in *Reynolds* existing at the time of the filing of the petition even though the subsequent refund did cover approximately ten months prior to the filing of the petition.

Section 553 of the Bankruptcy Code which permits the setoff of mutual debts and credits between a debtor estate and its creditors is merely a statutory recognition of the common law principle of setoff. Courts may look to state law in order to determine whether a setoff has occurred. *See United States on Behalf of IRS v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983), however, the granting or denial of the right to a setoff depends wholly upon the terms of § 553, and not upon the terms of state laws or statutes. *See, e.g., McCollum v. Hamilton National Bank*, 303 U.S. 245, 248, 58 S.Ct. 568, 570, 82 L.Ed. 819 (1938); *Matter of Van Dyk Research Corp.*, 13 B.R. 487, 494–95 (Bkrtcy.D.N.J. 1981). It is, therefore, useful to examine New Jersey case law on the issue of setoff.

In *Hudson United Bank v. House of Supreme, Inc.*, 149 N.J.Super. 153, 373 A.2d 438 (Ch.Div.1977), judgment was entered for Hudson United Bank (bank) against the House of Supreme, Inc. in state court for $784,529.00. The court determined that the defendant was insolvent and appointed a receiver pursuant to N.J.S.A. 14A:14–2. The bank made a motion to permit setoff of this judgment against various accounts of the defendant which were held in the bank pursuant to N.J.S.A. 14A:14–8. The receiver asserted that with the exception of the checking account, all of the defendant's accounts were "special deposits" and must be returned to the receiver. The court noted:

The general rule is that a bank has a right of setoff against all monies or funds in its possession belonging to a

depositor to secure the payment of the depositor's indebtedness to the bank [citations omitted]. However, the weight of authority on the issue of setoff by banks recognizes a distinction between general deposits and special deposits. This distinction arises as an exception to the general rule as a condition precedent to the accrual of the right of setoff in that before the fund can be setoff it must have been deposited without restrictions and not have been a special fund.

149 N.J.Super at 156–57, 373 A.2d 438. The court concluded in that case that monies deposited in the bank pursuant to agreements which provided that the accounts were to be held by the bank and applied to the payment of any paper obligation of the depositor, due or to become due, were subject to the bank's setoff right. *See also, American Lumberman's Co. v. Bradley Construction Company,* 127 N.J.Eq. 500, 13 A.2d 783 (Ch. 1940), *aff'd.* 129 N.J.Eq. 278, 19 A.2d 242 (Ct. E & A 1941) (bank may not setoff for debts against an account which is in the nature of a trust fund where the bank had notice of such facts); *Reinhardt v. Passaic-Clifton National Bank,* 16 N.J.Super 430, 84 A.2d 741 (App.Div.1951), *aff'd.* 9 N.J. 607, 89 A.2d 242 (1952) (the bank could not setoff stop payment on a check, which order it neglected to follow where the depositor had opened the checking without any suggestion of a release clause with respect to inadvertent payment on a stop payment order).

Several cases in New Jersey have discussed generally the nature of setoff and its rationale. For instance, in *John Wills, Inc. v. Citizens Bank of Netcong,* 125 N.J.L. 546, 16 A.2d 804 (Ct. E. & A. 1940), the court stated:

It is entirely settled in this state that as between a bank and a depositor the money deposited by the latter with the former creates a relationship of creditor and debtor between the depositor and the bank. It is also settled that the right of setoff does not exist unless each of the parties owes a stated sum to the other.

"Setoff, both at law and in equity, must be understood as that right which exists between two parties each of whom under an independent contract owes an ascertained amount to the other to setoff his respective debts by way of mutual deduction so that in any action brought for the larger debt, the residue only, after such deduction, shall be recovered." 24 R.C.L. 792.

125 N.J.L. at 548, 16 A.2d 804.

A later New Jersey case also discusses the rationale and requirements of setoff under New Jersey law:

A bank has a right of setoff against all monies or funds in its possession belonging to a depositor to secure the payment of the depositor's indebtedness to the bank. [citations omitted]. This is commonly referred to as a "banker's lien," although technically it is not a lien but an application of payment. If regarded as a lien, it is a "possessory lien," only entitling the bank to retain possession of the deposit for application of a proper setoff. [citation omitted].

The right to set-off arises only when the deposit is general, i.e., in the usual course of business without restriction. In such case the deposit becomes the property of the bank and the depositor becomes a creditor of the bank for the amount deposited.

To establish a right to set-off, three conditions must be satisfied: the fund to be set off must be the property of the debtor, the fund must be deposited without restrictions, and the existing indebtedness must be due and owing.

*Federal Deposit Ins. Corp. v. Pioneer State Bank,* 155 N.J.Super. 381, 389–90, 382 A.2d 958 (Law.Div.1977).

New Jersey law, however, recognizes there is a distinction in the due and owing requirement when an insolvency proceeding is involved. In *Shields v. John Shields Const. Co.,* 83 N.J.Eq. 21, 89 A. 1022 (Ch. 1914), a corporation borrowed money on two notes, one of which matured the day after the corporation was adjudged insol-

vent and the other subsequently. The company was adjudged insolvent on December 29, 1905, and the one note matured on December 30, 1905. On January 2, 1906, the bank setoff the balance in the insolvent corporation's deposit against the notes and proved its claim for the balance due. The issue in *Shields* was whether the bank had the right to setoff its claim and then prove for the difference. 83 N.J.Eq. at 22, 89 A. 1022. The chancery court noted that:

> The court of errors and appeals has very recently in the case of *Butler v. Commonwealth Tobacco Co.*, 74 N.J.Eq. 423 [70 A. 319], held that our statute [§ 66 of N.J. Corporation Act] [2] in so far as it deals with insolvent corporations is essentially a bankrupt act and that its provisions should be construed accordingly. The Bankrupt act (section 68) provides that
>
> > "in all cases of mutual debts **or mutual credits** between the estate of a bankruptcy and a creditor, the account shall be stated and one debt shall be set off against the other and the balance only shall be allowed or paid."
>
> The act not only uses the expression "mutual debts" but the broader phrase, "mutual credits." The expression in our Corporation act, "mutual dealings" is, as Judge Elmer points out, broad enough to include them both. It is well settled that in bankruptcy proceedings debts not yet due are the subject of set-off. A late case, in which the law and the reasons for it are clearly stated is *Matter of Philip Semmer Glass Co.*, 11 Amer.B.R. 665. A still later case is *Frank v. Mercantile Nat. Bank*, 182 N.Y. 264 [74 N.E. 841], in which Chief-Justice Cullen holds the same way. He says: "If the defendant's rights depended on the equitable rule of set-off as it obtains in this state, it is clear that the notes held by it (the company) which had not matured at the time of the transfer of the title from the bankrupt to his assignee could not be set off against the plaintiff's claim." But, he adds, the defendant's claim is not based upon the rule in equity but on the provisions of the bankrupt law. As to that he says the uniform current of authority in the district and circuit courts of the United States and, he thinks, in the supreme court, is to the effect that as unmatured claims are provable against the bankrupt's estate, they are necessarily the subject of set-off under the provisions of section 68 of the Bankruptcy act.

83 N.J.Eq. at 24, 89 A. 1022. Thus, the court in *Shields* found that in an insolvency proceeding, whether it was brought under the state or federal bankruptcy laws, the requirement that a debt be due and owing in order for setoff to occur is modified and claims which are contingent can be the subject of setoff. *Id.* at 24–25, 89 A. 1022.

In the case of *United States on Behalf of IRS v. Norton*, 717 F.2d 767 (3d Cir. 1983) the Third Circuit discussed at length the interplay of 11 U.S.C. § 553 and 11 U.S.C. § 362. Finding that under applicable Pennsylvania law the retention of a debtor's fund by a creditor provided sufficient evidence of an intent to setoff, the court found that the IRS' retention of a debtors' tax refund and its actions in setting it off against the debtors' pre-petition tax debts violated the automatic stay imposed by Section 362. 717 F.2d at 772–774.

The *Norton* court specifically commented in regard to bank setoffs:

> This Court has already prohibited banks from setting off debts against a corporate account during the pendency of a reorganization, unless those banks first request and receive relief from the automatic stay in a bankruptcy court. *In re Penn Central Transportation Co.*, 453 F.2d 520 (3d Cir.1972). Without the auto-

---

**2.** The court in *Shields* earlier referred to the relevant portion of this statute:

> The question, as I view it, must be resolved by reference to the provisions of our Corporation act. Section 66 directs the receiver "in the case of mutual dealings between the corporation and any person to allow just set-offs in favor of such person in all cases in which the same ought to be allowed according to law or equity."

83 N.J.Eq. at 22, 89 A. 1022.

matic stay of setoff rights during reorganization, the Court reasoned, the loss of bank accounts and of accounts receivable would probably prove fatal to many otherwise viable businesses. If a bank could freeze the debtor's account upon the filing of a petition in bankruptcy, the debtor's chances for successful rehabilitation would be substantially diminished. 717 F.2d at 773.

In the case at bar, the Bank denied the debtor access to its funds on account as early as October 4, 1985, prior to the debtor's filing of its bankruptcy petition, when the Bank debited the debtor's general account in the sum of $765,000.00. The Bank's initial retention of the balance of the demand deposit account of ESA up to the amount of the outstanding letters of credit was, according to the October 15, 1985 correspondence sent to ESA from counsel for the Bank, effectuated to obtain collateral for the reimbursement obligations of ESA under those letters of credit.

The Bank thereafter continued to retain the credit balance in the debtor's account in the Bank's view arguably to preserve its future exercise of setoff rights. Subsequent to the filing of the debtor's Chapter 11 petition on November 14, 1985 the Bank moved before this court for relief from the automatic stay to exercise its setoff rights. This motion resulted in the entry of a consent order on February 27, 1986 which order provided for a portion of the withheld funds to be turned over to ESA, and the balance to be held in an interest-bearing account pending the further order of this court. Subsequently, the Bank by the motion now before this court seeks to setoff against the obligations owed by the Bank to the debtor, the specific sum of $379,405.00 paid to American Home.

Under New Jersey case law, the charging or debiting of a debtor's funds on deposit by a creditor bank has been recognized as constituting a setoff. *See John Wills Inc. v. Citizens National Bank of Netcong*, 125 N.J.L. 546, 550, 16 A.2d 804 (Ct. E & A 1940). Accordingly, the Bank

ostensibly exercised an offset when it retained the debtor's funds prior to the date of the filing of the debtor's Chapter 11 petition. The Bankruptcy Code does not expressly distinguish the right of setoff and the exercise of that right. The courts, however, have recognized a Congressional policy under the Bankruptcy Code which recognizes setoff as a right that should be preserved while at the same time acknowledging that its free exercise could inhibit rehabilitation and bankruptcy policies such as fair distribution of funds. *See United States on Behalf of IRS v. Norton*, 717 F.2d at 773, citing H.Rep. 595, 95th Cong., 1st Sess. 118, 274 (1977). The *Norton* court stated in regard to pre-petition setoffs:

> [B]efore a setoff can be made against the debts owed by a petitioner in bankruptcy, a creditor must seek relief from the automatic stay. Even setoffs effected before bankruptcy may be investigated and reviewed by the Bankruptcy Court.

717 F.2d at 771.

It is well settled that the filing of the bankruptcy petition fixes "the line of cleavage with reference to the conditions of the bankrupt estate" and that only debts or credits existing at the time of the filing can be setoff against the other. *See In re Morristown Lincoln-Mercury, Inc.*, 42 B.R. 413, 417 (Bkrtcy.E.D.Tenn.1984).

■ Section 553 clearly prohibits the setoff of a creditor's post-petition claim against a debtor's pre-petition liability. Section 553 does not in the instant case prohibit setoff against the pre-petition debt owed by the Bank to the debtor of the Bank's pre-petition claim against ESA for reimbursement under the open letters of credit, which claims arose pre-petition, although they were contingent and unliquidated as of the date of the filing of the debtor's bankruptcy petition.

■ In this case there can be no question about the existence of the Bank's claim against the debtor arising by virtue of the execution of the two open letters of credit before the filing of the debtor's Chapter 11

petition. The Bank's claim against ESA is a pre-petition claim upon which the liability of the Bank is absolute, although not presently due, contingent and unliquidated on the date the Chapter 11 petition was filed. It is not necessary that the debt sought to be setoff be due when the bankruptcy case is commenced. The Bank's right of setoff is nonetheless present. This court recognizes the equitable nature of setoff rights under the Bankruptcy Code and the discretion which the court has to deny a creditor's right to setoff where the rehabilitative policies and goals of the Bankruptcy Code are retarded. No showing was made by the debtor in opposition to the Bank's motion for setoff to demonstrate an inability by the debtor to operate its business without these funds. Had such showing been made, the court would have weighed those facts against the Bankruptcy Code's policy of preserving the rights of setoff.

It has not been asserted herein that the provisions of 11 U.S.C. § 553(b)(1) apply to this case regarding setoffs within ninety (90) days of the filing of the bankruptcy petition where the creditor improved its position in the 90–day period, or any other provision that may limit the Bank's right of setoff herein.

Accordingly, the Bank's motion for permission to setoff against the obligation owed by the Bank to the debtor the sum of $379,405.00 representing the sum paid by the Bank to American Home is granted. The debtor's motion for partial summary judgment on Count One of its complaint to the extent it seeks turnover by the Bank to ESA of the sum of $379,405.00 presently maintained in ESA's account no. 409421 is denied.

Remaining before this court is a determination of the disposition of the account balance of $50,000.00 in ESA's account no. 409421, which sum represents the face amount of the INA letter of credit. This sum is being held by the Bank pending final disposition of the entitlement to those funds by this court.

Subsequent to the close of hearings on the motions before this court, counsel for the Bank has advised the court and debtor's counsel, by letter dated October 22, 1986, that INA presented a sight draft in the amount of $50,000.00 to the Bank which draft was paid by the Bank. The Bank, by the aforesaid letter, sought to amend its motion for setoff to include a request to setoff the sum of $50,000.00 resulting from the Bank's payment of the INA draft. The court will grant the Bank leave to forthwith move by formal application for permission to setoff that sum. The balance of funds in excess of $379,405.00 in debtor's account no. 409421 shall be held by the Bank, subject to further order of this court.

The debtor's motion for partial summary judgment as it relates to turnover of the remaining $50,000.00 account balance will be considered concurrently with the Bank's request to setoff the sum of $50,000.00 against obligations it owes to the debtor.

An order shall be submitted in accordance with this decision.